

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-16-00011-CV

_____

IN THE MATTER OF J.M.G., A JUVENILE

On Appeal from the County Court at Law No. 1
Hunt County, Texas
Trial Court No. J-02355

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

J.M.G., a juvenile, pled true to the State's allegation that in 2011 he engaged in delinquent conduct that would constitute indecency with a child by contact. The trial court found that J.M.G. had engaged in the delinquent conduct and, after a disposition hearing, entered a disposition order committing him to the Texas Juvenile Justice Department (TJJD) for an indeterminate period, not to exceed his nineteenth birthday.

Appealing the disposition order, J.M.G. argues that the trial court abused its discretion by committing him to the TJJD instead of "put[ting] him on probation with a placement outside the home at a secured facility boot camp in Grayson County." We affirm the trial court's disposition order because we conclude, after reviewing the appellate record, that the trial court did not abuse its discretion in entering it.

## I.  Standard of Review

"A trial court's decision to commit a child who has been found to have engaged in delinquent conduct that constitutes a felony offense to the Texas Juvenile Justice Department without a determinate sentence" is governed by Section 54.04013 of the Texas Family Code. TEX. FAM. CODE ANN. § 54.04013 (West Supp. 2016). That Section requires the trial court to make a "special commitment finding that the child has behavioral health or other special needs that cannot be met with the resources available in the community" after "consider[ing] the findings of a validated risk and needs assessment and the findings of any other appropriate professional assessment available to the court." *Id.*; *see* TEX. FAM. CODE ANN. § 54.04(d)(2) (West Supp. 2016). The trial court made all of the required statutory findings, which J.M.G. does not challenge.

2

Instead, J.M.G. argues that the trial court should have placed him in a less restrictive but secure boot-camp facility. "[A]fter a juvenile has been adjudged to have engaged in delinquent conduct, the juvenile court has broad discretion to determine a suitable disposition." *In re A.D.*, 287 S.W.3d 356, 366 (Tex. App.—Texarkana 2009, pet. denied); *see In re J.R.C.*, 236 S.W.3d 870, 873–74 (Tex. App.—Texarkana 2007, no pet.). Accordingly, "[w]e will not reverse the juvenile court's findings regarding disposition absent a clear abuse of discretion." *A.D.*, 287 S.W.3d at 366.

"Merely because a trial court has decided a matter within its discretionary authority in a manner different from how an appellate court would have ruled in a similar circumstance does not demonstrate an abuse of discretion." *Id.* Instead, "[a] trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to guiding rules or principles." *In re J.M.*, 287 S.W.3d 481, 486 (Tex. App.—Texarkana 2009, no pet.). "A trial court does not abuse its discretion if some evidence supports the decision." *Id.*; *see A.D.*, 287 S.W.3d at 366 (an abuse of discretion does not occur where the trial court bases its decision on conflicting evidence).[1]

## II.     The Evidence

"The [TJJD] is the most severe form of incarceration in the juvenile justice system, and it is neither reasonable nor appropriate in the area of juvenile law to use the final, most restrictive form of detention in all situations." *J.R.C.*, 236 S.W.3d at 873. "Trial courts have discretion in

---

[1]"In conducting this review, we engage in a two-pronged analysis: (1) did the trial court have sufficient information upon which to exercise its discretion; and (2) did the trial court err in its application of discretion?" *A.D.*, 287 S.W.3d at 366. Accordingly, "[t]he traditional sufficiency of the evidence issues become relevant factors in assessing whether the trial court abused its discretion." *Id.* (citing *In re A.E.E.*, 89 S.W.3d 250, 256 (Tex. App.—Texarkana 2002, no pet.).

this context . . . to select the appropriate form of detention for juvenile offenders, and should exercise that discretion based on the facts of each case." *Id.* Based on the facts of this case, we find that J.M.G. cannot demonstrate that the trial court abused its discretion in entering its disposition.

J.M.G. is a fifteen-year-old child who has been diagnosed with a variety of mental-health disorders, including autism, Asperger's syndrome, bipolar disorder, attention deficit disorder, unidentified depressive disorder, conduct disorder, and oppositional defiant disorder. Cindy Cooley, a juvenile probation officer and the assistant director at the Juvenile Probation Department, testified that J.M.G. has an average intelligence quotient of 107 and "is a bright student, making A's in his subjects," but has received special education services for most of his life as a result of his behavior.

A predisposition report prepared by Hunt County Juvenile Probation Services, which was admitted into evidence at the disposition hearing, demonstrated that J.M.G. had been in and out of "residential care dating back to early childhood." J.M.G.'s mother reported that he had been "sexually acting out since the age of 2." In 2004, when J.M.G. was four years old, he was "caught trying to force [his] brother to lick [his] penis." In the same year, Child Protective Services received a report that J.M.G. "tried to insert a toy into [a] relative[']s rectum, and while in a lying position, tried pulling panties aside." In 2005, J.M.G. was kidnapped by his biological father, a registered sex offender, who J.M.G. alleged had sexually abused him. For several years after that, J.M.G. experienced behavior problems and nightmares and began counseling and therapy.

In 2008, when J.M.G. was seven years old, he exposed himself to students at school and tried to convince a student to touch his penis. He began treatment with Pennye West, a licensed professional counselor, and was also admitted into Glen Oaks Hospital where he was treated by a psychiatrist. In 2009, J.M.G. was admitted into Timber Lawn Hospital and then Terrell State Hospital after he threatened to kill himself and his mother. He continued receiving mental-health treatment until 2011, when he committed an act that would constitute indecency with a child.

J.M.G. was eleven years old when he was caught with a toddler with his pants down behind closed doors. When asked about the incident, J.M.G. "advised that he was only having [the child] touch him." He was arrested and pled true to the State's allegation that he had committed an act that would constitute indecency with a child. A few months after that incident, J.M.G.'s brother, who was also autistic, again "made an outcry, sexual in nature," against J.M.G., and J.M.G. also sexually "acted out on his . . . 20[-]month[-]old [sister]." It was also reported that J.M.G. "attempted to victimize school mates [sic] and neighborhood children." Distraught, J.M.G.'s mother dropped him off at the police department and said that she could not care for J.M.G. while protecting his siblings from his sexual behavior.[2]

J.M.G. was admitted to Willow Bend, a residential treatment facility, in December of 2011 and remained there until November 2012. While at Willow Bend, J.M.G. was treated to correct his inappropriate sexual behaviors. Despite that treatment, J.M.G. committed sexually inappropriate acts in violation of the program's rules, including grabbing a staff member's buttocks

---

[2]Cooley commended J.M.G.'s mother for her tireless efforts in getting her son the appropriate mental-health and sex-offender treatment. Cooley testified that "despite the parents' enormous efforts to secure their home, there have been alarms and cameras and locks on doors. Despite those things, there still has been victimization happening inside the home and . . . on the premises of the home."

and refusing to zip up his pants when he was not wearing underwear. The Willow Bend treatment providers did not believe that J.M.G. was participating or progressing in the program, and he was transferred into Pegasus Residential Treatment Center where he remained for twenty months.

In 2013, while at Pegasus, J.M.G. reported that he committed indecency with a male child cousin. He also "disclosed sexually assaulting a ten-year-old step-sister and exposing himself to other children, including at school." J.M.G. received sex-offender treatment, but notes from Pegasus showed that J.M.G. was aggressive, uncooperative, disruptive, and did not appear to be progressing. West testified that J.M.G. was unable to complete the fourth phase of treatment at Pegasus, which would have reintegrated him into society, because his grandfather pushed for and obtained J.M.G.'s release from the program in August 2014. Following his release from Pegasus, J.M.G. was placed with his grandparents and then returned to his mother's home in March 2015.

In June 2015, John Doe made an outcry against J.M.G. which resulted in J.M.G.'s second arrest. Doe alleged that J.M.G. had exposed himself and asked Doe to touch his penis. Shortly thereafter, the State filed its petition for adjudication in this case and, by a series of court orders, the trial court required that J.M.G. be detained in the Hunt County Juvenile Detention Center from August 2015 until the date of his disposition hearing on January 21, 2016.

At the disposition hearing, J.M.G. asked to be placed in the Grayson County Boot Camp or returned to Pegasus instead of being sent to TJJD. His mother testified that she did not believe that TJJD was the best option available for J.M.G.

However, the trial court heard evidence that J.M.G., while at the detention center, "had to be removed from class for masturbating while sitting at his desk" on December 4, 2015. West,

6

who had been treating J.M.G. for eight years, testified that he needed to be in a "[v]ery structured" environment where "[f]ree time is monitored" and where he would be "limited to certain options only." West described J.M.G. as an opportunistic offender who would reoffend if introduced to a vulnerable person and reiterated that constant supervision was required. West penned a letter on December 22, 2015, explaining that J.M.G. admitted that he does not know how to control his sexual desires and that he was not sure if he could resist acting out sexually again.

Based on J.M.G.'s history and West's letter, Cooley recommended that J.M.G. be committed to the TJJD for sex-offender and mental-health treatment, adding, "We do not feel that being placed in the community is appropriate for him or the safety of the public." According to Cooley, Grayson County Boot Camp and Pegasus "[were] similar if not exact to what has already been done." The trial court agreed. In its findings, the trial court wrote:

> The proposed Grayson County Secure Facility offers treatment similar to that which the child has already had and would not provide any treatment that has not been completed by the juvenile. . . . Based on this past history of therapy and offending history the court believes the longer the potential treatment available for the juvenile the better.

## III. Analysis

"A trial court is not required to exhaust all possible alternatives before sending a juvenile to the [TJJD]." *J.R.C.*, 236 S.W.3d at 875. Here, the trial court had ample evidence to rely on in deciding the proper disposition for J.M.G. It was aware of J.M.G.'s long history of mental-health issues and his history of inappropriate sexual acts. The trial court heard that Pegasus and Willow Bend had been offering J.M.G. sexual-offender treatment for several years, but that J.M.G. continued to offend, even while placed in the Juvenile Detention Center during the pendency of

7

this case. West testified that J.M.G. needed an environment that would even regulate J.M.G.'s free time because he was an opportunistic sexual offender.

Failure to complete a local treatment program successfully supports a finding that TJJD may be more appropriate than placing a juvenile into another local treatment program. *See J.R.C.*, 236 S.W.3d at 870. Because nothing demonstrated that either the Grayson County Boot Camp and Pegasus could provide any treatment that had not already been provided to J.M.G. and because Pegasus records contained incident reports demonstrating his disruption of the program, neglect of therapy, power struggles with staff, and failure to follow directives, the trial court could reasonably find that J.M.G. would have similar problems in another residential treatment facility or boot camp.

In light of the evidence presented at the disposition hearing, we cannot conclude that the trial court abused its discretion in determining that the proper disposition for J.M.G. was to be sent to the TJJD. *See J.R.C.*, 236 S.W.3d at 874; *In re M.A.*, 198 S.W.3d 388, 391–92 (Tex. App.—Texarkana 2006, no pet.). Accordingly, we overrule J.M.G.'s point of error.

## IV.     Conclusion

We affirm the trial court's disposition order.


Ralph Burgess
Justice

Date Submitted:     October 11, 2016
Date Decided:       November 29, 2016