**Opinion issued June 27, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00405-CV**

**NO. 01-23-00406-CV**

**NO. 01-23-00407-CV**

**NO. 01-23-00408-CV**

**NO. 01-23-00409-CV**

**NO. 01-23-00410-CV**

**NO. 01-23-00942-CV**

**NO. 01-23-00943-CV**

———————————

**IN THE MATTER OF G.G.**

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2021-01476J, 2022-01756J, 2022-01780J, 2022-01799J,**
**2023-00112J, 2023-00113J, 2023-00114J, 2023-00115J**

---

**MEMORANDUM OPINION**

In this juvenile delinquency case, the trial court found that appellant G.G. ("Gabriel")[1] engaged in delinquent conduct by committing the offense of aggravated assault and ordered him to serve probation.[2] While on probation, Gabriel committed the offense of evading detention and six aggravated robbery offenses.[3] At an adjudication hearing, Gabriel stipulated that he had committed each offense. The juvenile court found that Gabriel engaged in delinquent conduct with respect to the evading detention and aggravated robbery offenses and found that Gabriel violated his probation for the aggravated assault offense. The court also found that the best interest of Gabriel and the community would be served by committing him to the Texas Juvenile Justice Department ("TJJD" or "the Department"). The court signed judgments committing Gabriel to the care of the Department for an indeterminate period in the aggravated assault and evading detention cases and determinate

---

[1]    In this opinion, we refer to the juvenile appellant by a pseudonym to protect his privacy. *See* TEX. FAM. CODE § 56.01(j) ("Neither the child nor his family shall be identified in an appellate opinion rendered in an appeal or habeas corpus proceedings related to juvenile court proceedings under this title.").

[2]    *See* TEX. PENAL CODE § 22.02(a)(2).

[3]    *See id.* §§ 38.04(a) (evading detention), 29.03(a)(2) (aggravated robbery).

judgments committing Gabriel to the care of the Department for ten years in the six aggravated robbery cases.[4]

On appeal, Gabriel contends that the juvenile court erroneously refused to admit (1) a "Mitigation Memorandum" that provided information about Gabriel's background and a residential treatment program geared towards helping boys who had experienced trauma in their lives; and (2) a "Legal Memorandum" that provided information concerning the immigration consequences of findings of delinquent conduct. Gabriel further argues that the juvenile court abused its discretion by committing him to the Department because there was legally and factually insufficient evidence that reasonable efforts were made to prevent Gabriel from being removed from his home and to make it possible for him to return home.

We affirm.

**Background**

Gabriel became involved with the juvenile justice system in September 2021, at age fifteen, when he allegedly committed the offense of aggravated assault with a

---

[4] Appellate cause number 01-23-00405-CV corresponds to trial cause number 2022-01799J. Appellate cause number 01-23-00406-CV corresponds to trial cause number 2022-01780J. Appellate cause number 01-23-00407-CV corresponds to trial cause number 2023-00113J. Appellate cause number 01-23-00408-CV corresponds to trial cause number 2023-00112J. Appellate cause number 01-23-00409-CV corresponds to trial cause number 2023-00115J. Appellate cause number 01-23-00410-CV corresponds to trial cause number 2021-01476J. Appellate cause number 01-23-00942-CV corresponds to trial cause number 2023-00114J. Appellate cause number 01-23-00943-CV corresponds to trial cause number 2022-01756J.

deadly weapon. The State filed a petition seeking an adjudication that he had engaged in delinquent conduct. During a psychological evaluation following his detention, Gabriel reported that he had used multiple controlled substances. Specifically, Gabriel reported that he used marijuana almost daily, and he had also used Xanax, cocaine, alcohol, ecstasy, mushrooms, Adderall, and synthetic marijuana. Gabriel successfully completed an inpatient drug treatment program at an Austin facility in May 2022, but he started using marijuana again immediately after he returned home.

In June 2022, Gabriel stipulated that he had engaged in the aggravated assault alleged in the State's delinquency petition, and the juvenile court found that Gabriel had engaged in delinquent conduct. The juvenile court placed Gabriel on probation until January 2024 and ordered him to remain in his mother's custody.

Two months after the court placed Gabriel on probation, in August 2022, he ran away from his mother's home and stayed away for approximately two months. Although Gabriel was in contact with his mother during this time, she was unaware of his whereabouts.

Beginning in early October 2022, Gabriel committed a series of new offenses over the course of five days. On October 7, 2022, Gabriel and an associate allegedly accosted Sara Richards outside of a liquor store in Houston and demanded that she hand over the keys to her car. Gabriel pointed a gun at Richards and threatened to

4

kill her if she did not comply. Richards tried to run back into the store, but Gabriel "wrapped his arms around her and brought her down to the ground." After a store employee went outside, Gabriel and his associate left the scene.

Later that same day, Houston Police Department Officer D. Ryals encountered Gabriel driving a car that had been reported as stolen. Officer Ryals attempted to conduct a traffic stop, but Gabriel refused to stop, driving through several stop signs before crashing into another vehicle in a parking lot. After the crash, Gabriel took off running, but Officer Ryals was able to apprehend him. As he did so, a pistol fell onto the ground from Gabriel's waistband. Upon checking computer records, Officer Ryals discovered that the pistol had also been reported as stolen.

Four days later, on October 11, 2022, Gabriel was involved in five more aggravated robberies around the Houston area. Allan Thompson was delivering food in an apartment complex when Gabriel and another male approached him, pointing guns at him. Gabriel and the other male absconded with Thompson's car.

After stealing Thompson's car, Gabriel and his associate drove to a gas station and encountered Mairo Guevara, who was walking back to his car after leaving the convenience store. Gabriel punched Guevara in the face and stomach several times while his associate brandished a gun. Gabriel and his associate also demanded

5

money, and Guevara complied. Guevara ran back inside the convenience store, and Gabriel and his associate fled in Thompson's car.

That same day, Gabriel and his associate approached Emmanuel Mejia and his girlfriend while they were washing their cars at a carwash. Gabriel displayed a gun and demanded that Mejia surrender his car keys. After Mejia handed his keys over, Gabriel ordered Mejia to turn around. When Mejia complied, Gabriel hit him in the head with the gun. Gabriel and his associate were unable to drive Mejia's car, as it had a manual transmission, so they stole Mejia's girlfriend's car and fled the carwash.

Gabriel and his associate committed two more aggravated robberies at gas station convenience stores on October 11. Ashley Williams was standing in line at a convenience store when Gabriel "pushed past her and then pointed a gun at the clerk and demanded money." Gabriel's associate approached Williams and ordered her to hand over her purse. Gabriel then turned around and pointed a gun at Williams's head. Williams struggled, but she ultimately gave up her purse.

Finally, at a different gas station, Luis Calles left the convenience store and began walking to his car. Gabriel ran up behind Calles and punched him in the back of the head. When Calles turned to defend himself, he saw that Gabriel had a gun pointed at him. Gabriel demanded that Calles relinquish his wallet and car keys, which Calles did. Gabriel and his associate left the scene in Calles's car.

In addition to the original aggravated assault charge, the State filed seven new petitions alleging delinquent conduct arising out of Gabriel's actions in October 2022. The State also moved to modify the disposition in the original aggravated assault case, alleging that Gabriel had violated the conditions of his probation by committing the seven new offenses.

Gabriel was detained at the Harris County Juvenile Detention Center during the pendency of the eight underlying cases. On two occasions—in November 2022 and April 2023—he was transferred to the Harris County Psychiatric Center, where he received psychiatric treatment. On both occasions, Gabriel spent approximately one month at the Harris County Psychiatric Center before being transferred back to the Juvenile Detention Center due to behavioral issues.

The juvenile court held an adjudication hearing on May 15, 2023. At this hearing, Gabriel stipulated on the record that he violated his probation in the aggravated assault case. He also stipulated that the allegations in the evading detention case and the six aggravated robbery cases were true. The juvenile court admitted signed, written stipulations for each offense. The court accepted Gabriel's stipulations as true, declared that he was a juvenile who had engaged in delinquent conduct and needed rehabilitation, and proceeded to disposition of the cases.

The juvenile court admitted a "probation report" during the disposition hearing. This exhibit contained multiple documents prepared during Gabriel's

7

detention, including a "Court Report Information Summary," a "Psychological Screening" completed at the Harris County Juvenile Detention Center, a "Court Ordered Psychological Evaluation" completed by the Harris County Juvenile Forensic Unit, a "Return to Court Summary," and a "PACT Pre-Screen Response Report." Gabriel participated in several evaluations and candidly answered questions about his background. The documents in the probation report contained extensive information about the charged offenses, Gabriel's mental health history, his family's emigration from Honduras, his substance abuse history, traumatic experiences he had suffered during his life, family history, possible gang affiliation, intellectual and psychological examination results, educational history, and treatment recommendations by mental health professionals.

Gabriel introduced two exhibits during the hearing: (1) the Mitigation Memorandum, which was prepared by an employee of the Harris County Public Defender's Office; and (2) the Legal Memorandum, which was prepared by an assistant public defender and discussed the possible immigration consequences of findings of delinquent conduct. The State objected to both exhibits based on relevancy and hearsay. The juvenile court sustained the State's objections and refused to admit the exhibits into evidence, but the court also told Gabriel's counsel that it would like to hear the opinions of the exhibits' authors during argument.

Four witnesses testified during the disposition hearing. Gabriel's mother testified concerning the difficulties their family faced as they immigrated to the United States. She also testified concerning violence that Gabriel had witnessed in the community, his association with friends who had a negative influence on him, his substance abuse issues, and his mental health issues. Gabriel's mother did "not justify what he did," but she asked that Gabriel be placed somewhere he could be rehabilitated. She wanted Gabriel to receive help with his substance abuse issues and be placed on probation so he could return home as soon as possible.

Dr. Megan Manheim, with the Harris County Juvenile Probation Department, met with Gabriel approximately once a week over a period of several months while he was detained. Gabriel's diagnoses included PTSD, major depressive disorder, unspecified anxiety disorder, and several substance abuse disorders. Gabriel had witnessed community violence in both Honduras and Houston, and he had been sexually assaulted as a young boy. Gabriel used drugs—primarily marijuana and Xanax—as a coping mechanism. Dr. Manheim testified that Gabriel was "very hypervigilant" and "always concerned about what's going on around him," which led to him making rash and impulsive decisions. Dr. Manheim believed that this behavior would continue if Gabriel did not receive appropriate treatment.

Dr. Manheim advised the court that Gabriel had been accepted to the "Court 360" program, and the Court 360 team recommended that Gabriel be placed with the

Harris County Leadership Academy. Dr. Manheim believed that "wherever [Gabriel] goes, he needs a trauma informed treatment approach, where he would be getting individual treatment, as well as group treatment, and family therapy, as well." She agreed that TJJD facilities "do have individualized services for juveniles," and Gabriel would be able to continue receiving any prescribed psychoactive medications while at TJJD.

In addition to Gabriel's mother and Dr. Manheim, two of the complainants—Richards and Williams—testified at the hearing. They both briefly testified concerning their encounters with Gabriel and about how the robberies had impacted their lives in the months since the incidents.

At a later hearing, the juvenile court stated on the record that it was in Gabriel's best interest to be placed outside of his home. The court stated: "All reasonable efforts have been made to avoid or eliminate the necessity for removing you from your home, but you can't receive the quality of care and level of support or supervision you need to successfully meet and complete the condition of probation." The court committed Gabriel to TJJD for a determinate sentence of ten years in the six aggravated robbery offenses. For the other two offenses—the original aggravated assault case and the evading detention case—the court ordered Gabriel committed to TJJD for an indeterminate period. This appeal followed.

10

**Sufficiency of the Evidence**

In one issue with related subparts, Gabriel argues that the juvenile court should have admitted the Mitigation Memorandum and the Legal Memorandum. Gabriel also argues that the juvenile court's decision to commit him to the custody of the Department—rather than placing him on probation and requiring him to attend treatment programs or placing him in a residential facility—was not supported by legally or factually sufficient evidence.

## A. Standard of Review and Governing Law

Juvenile justice courts have jurisdiction over all cases involving delinquent conduct by a person who was a child at the time the person engaged in the conduct. TEX. FAM. CODE § 51.04(a); *In re I.F.M.*, 525 S.W.3d 884, 886 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* TEX. FAM. CODE § 51.02(2)(A) (defining "child" as including person who is "ten years of age or older and under 17 years of age"). The juvenile court must conduct an adjudication hearing for the factfinder to determine whether the juvenile engaged in delinquent conduct. *In re I.F.M.*, 525 S.W.3d at 886; TEX. FAM. CODE § 54.03(a); *see also* TEX. FAM. CODE § 51.03(a)(1) (defining "delinquent conduct" to include "conduct, other than a traffic offense, that violates a penal law of this state or of the United States punishable by imprisonment or by confinement in jail"). If the factfinder determines that the juvenile engaged in delinquent conduct, the court must then conduct a disposition

hearing. *In re I.F.M.*, 525 S.W.3d at 886; TEX. FAM. CODE §§ 54.03(h), 54.04(a). "Disposition is akin to sentencing and is used to honor the non-criminal character of the [juvenile] proceedings." *In re B.D.S.D.*, 289 S.W.3d 889, 893 (Tex. App.— Houston [14th Dist.] 2009, pet. denied) (quotations omitted).

No disposition may be made under Family Code section 54.04 "unless the child is in need of rehabilitation or the protection of the public or the child requires that disposition be made." TEX. FAM. CODE § 54.04(c). If the juvenile court makes this finding allowing the court to make a disposition, the court has several options, including placing the child on probation, committing the child to TJJD without a determinate sentence, or committing the child to TJJD with a possible transfer to the Texas Department of Criminal Justice for a determinate term of years.[5] *See id.* § 54.04(d); *see also id.* § 54.04013 (allowing court to commit child to TJJD "without a determinate sentence" if child has engaged in conduct that constitutes felony

---

[5] Family Code section 53.045 sets out a list of offenses for which the prosecuting attorney may refer the delinquency petition to the grand jury for approval. *See* TEX. FAM. CODE § 53.045(a)–(b). These offenses include aggravated assault and aggravated robbery. *See id.* § 53.045(a)(6)–(7). Upon a finding of delinquent conduct based on one of these offenses, the juvenile court may sentence the juvenile to a determinate term of years in TJJD. *See id.* § 54.04(d)(3). Although the original aggravated assault offense was eligible for a determinate sentence, the State did not seek approval of this delinquency petition by a grand jury. Instead, the State only sought and received approval by a grand jury of the delinquency petitions for the six aggravated robbery offenses. Because these offenses are first-degree felonies, the juvenile court could have committed Gabriel to TJJD with a possible transfer to the Texas Department of Criminal Justice for a term of not more than forty years. *See id.* § 54.04(d)(3)(A).

12

offense and court finds "that the child has behavioral health or other special needs that cannot be met with the resources available in the community"). If the court commits the child to TJJD, the court "shall include in its order its determination that":

> (1) it is in the child's best interests to be placed outside the child's home;
>
> (2) reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home; and
>
> (3) the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of probation.

*Id.* § 54.04(i).

"A juvenile court has broad discretion to determine a suitable disposition for a juvenile who has been adjudicated as having engaged in delinquent behavior." *In re K.H.*, 682 S.W.3d 567, 575 (Tex. App.—Houston [1st Dist.] 2023, pet. denied). Similarly, we review a juvenile court's decision to admit or exclude evidence for an abuse of discretion. *In re A.W.*, 661 S.W.3d 547, 552 (Tex. App.—Houston [14th Dist.] 2023, pet. denied). A juvenile court abuses its discretion when it acts unreasonably, arbitrarily, or without reference to any guiding rules or principles. *In re K.H.*, 682 S.W.3d at 575. Under this standard, the legal and factual sufficiency of the evidence are relevant in evaluating whether the juvenile court abused its discretion. *Id.*; *In re C.G.*, 162 S.W.3d 448, 452 (Tex. App.—Dallas 2005, no pet.).

13

In reviewing the legal sufficiency of the evidence supporting a juvenile court's disposition, we "consider the evidence and inferences tending to support the trial court's findings and set aside the judgment only if there is no evidence of probative force to support the findings." *In re K.H.*, 682 S.W.3d at 575; *In re C.G.*, 162 S.W.3d at 452. We consider the evidence in the light most favorable to the judgment and indulge every reasonable inference that supports the judgment. *In re K.H.*, 682 S.W.3d at 575. Anything more than a scintilla of evidence is legally sufficient to support the trial court's finding. *Id.* In reviewing the factual sufficiency of the evidence, we consider and weigh all the evidence and set aside the judgment only if the finding is so against the great weight and preponderance of the evidence as to be clearly unjust. *Id.* at 575–76; *In re C.G.*, 162 S.W.3d at 452. A juvenile court does not abuse its discretion when it bases its decision on conflicting evidence. *In re C.J.H.*, 79 S.W.3d 698, 702 (Tex. App.—Fort Worth 2002, no pet.).

**B.    *Analysis***

On appeal, Gabriel argues that the juvenile court erred by refusing to admit the Mitigation Memorandum and the Legal Memorandum.[6] As a result of this

---

[6]    Although Gabriel states in his Issue Presented that the juvenile court abused its discretion by not admitting the Legal Memorandum into evidence, Gabriel provides no argument for why this exhibit was admissible. Instead, his appellate argument focuses solely on the Mitigation Memorandum. We therefore conclude that Gabriel has waived any argument that the juvenile court erred by refusing to admit the Legal Memorandum because he has not adequately briefed that issue. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *In re J.A.M.R.*,

14

failure, the juvenile court ultimately abused its discretion by committing him to TJJD because legally and factually insufficient evidence supported the court's determination that reasonable efforts were made to prevent Gabriel from being removed from his home and to make it possible for him to return home.

At a disposition hearing, notwithstanding the Texas Rules of Evidence, the juvenile court "may consider written reports from probation officers, professional court employees, guardians ad litem appointed under [Family Code] Section 51.11(d), or professional consultants in addition to the testimony of witnesses." TEX. FAM. CODE § 54.04(b). Section 54.04(b) "broaden[s] the pool of information available for the trial court's consideration at the disposition hearing." *In re J.S.S.*, 20 S.W.3d 837, 844 (Tex. App.—El Paso 2000, pet. denied). "[T]he juvenile court should have available to it as much information as possible to inform its determination of what disposition is appropriate in a given case." *Id.* However, section 54.04(b) "is discretionary; it permits the court to consider written reports but does not require it to do so." *In re X.J.*, No. 03-19-00460-CV, 2020 WL 7063682, at *7 (Tex. App.—Austin Dec. 3, 2020, no pet.) (mem. op.).

Gabriel's counsel offered the Mitigation Memorandum, which was prepared by Nancy Wade, who worked in "one of the ballistic divisions" in the public

---

303 S.W.3d 422, 425 (Tex. App.—Dallas 2010, no pet.) ("Bare assertions of error without argument or authority waive error.").

defender's office and "assist[ed] in writing mitigation packets by speaking to the family, as well as the client, to try to give more context in regards to the client's personal life, as well as struggles and other issues." The State objected on relevancy and hearsay grounds, noting that it had no information about Wade's credentials and that she was not present for cross-examination. The trial court sustained the State's objection but suggested that defense counsel "tell me in your argument what she said."

In the Mitigation Memorandum, Wade discussed Gabriel's childhood in Honduras, the circumstances that led to his family immigrating to the United States, and the dangers that his family faced while making the journey. The memorandum further discussed Gabriel's home life after he arrived in Houston, including estrangement from his father, witnessing domestic violence between his mother and her partner, and witnessing violence and shootings in his community. Wade also discussed Gabriel's mental health—including his struggles with anxiety, depression, and suicidal ideation—and findings made by the clinician who conducted Gabriel's psychological evaluation. Additionally, Wade discussed research concerning adverse childhood experiences, the impact that these experiences can have on an individual's behavior and development, and appropriate treatments to reduce the negative effects of these experiences.

16

The Mitigation Memorandum noted that Gabriel had been tentatively accepted to Woodward Academy, "a comprehensive boys' residential program that provides a trauma-informed approach to cultivate emotional and mental stability and management as well as personal accountability." Such a program would give Gabriel "the opportunities for personal growth, skill-building, and self-reflection that he has not previously been afforded while living a life of mere survival in an unstable and violent environment." Wade concluded that Gabriel was "a prime candidate for a probation program," and placing him in a rehabilitation program instead of committing him to TJJD would provide a greater likelihood of "addressing offending behavior and promoting positive change." Attachments to the memorandum included character reference letters, family photographs, scholarly articles about adverse childhood experiences, and news reports about violence in Gabriel's neighborhood.

As the State points out, section 54.04(b) does not require the juvenile court to admit written reports from professional consultants in addition to testimony at the disposition hearing. Instead, the juvenile court "may consider" such reports. *See* TEX. FAM. CODE § 54.04(b); *In re X.J.*, 2020 WL 7063682, at *7 (noting that section 54.04(b) is "discretionary" and does not require juvenile court to consider written reports). Because the juvenile court was not required to admit the Mitigation

Memorandum prepared by Wade, we conclude that the court did not abuse its discretion by failing to admit the memorandum.

However, even if the juvenile court erred by not admitting the Mitigation Memorandum, we conclude that any error was harmless because the material contained in the memorandum was cumulative of evidence that was properly before the juvenile court, including the probation report and the testimony of Gabriel's mother and Dr. Manheim. Furthermore, we conclude that the trial court had sufficient evidence before it to exercise its broad discretion in committing Gabriel to TJJD.

When a juvenile court commits a child to TJJD, it must find that "reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home." TEX. FAM. CODE § 54.04(i)(1)(B). "Reasonable efforts," however, "does not mean that 'services' must first be explored." *In re K.H.*, 682 S.W.3d at 576 (quoting *In re W.J.P.*, No. 01-19-00988-CV, 2021 WL 2931437, at *3 (Tex. App.—Houston [1st Dist.] July 13, 2021, no pet.) (mem. op.)); *In re B.R.*, No. 02-19-00328-CV, 2020 WL 3969556, at *6 (Tex. App.—Fort Worth June 18, 2020, no pet.) (mem. op.). A juvenile court is "not required to exhaust all possible alternatives before sending a juvenile to the TJJD." *In re K.H.*, 682 S.W.3d at 576 (quoting *In re W.J.P.*, 2021 WL 2931437, at *3); *see In re J.R.C.*, 236 S.W.3d 870, 875 (Tex. App.—Texarkana

18

2007, no pet.) ("The Texas Family Code permits a trial court to decline third and fourth chances to a juvenile who has abused a second chance.").

Generally, a juvenile court does not abuse its discretion by committing a juvenile to TJJD "when a delinquent juvenile has engaged in some type of violent activity that makes the juvenile potentially dangerous to the public." *In re K.H.*, 682 S.W.3d at 576 (quoting *In re W.J.P.*, 2021 WL 2931437, at *3); *In re T.D.*, No. 12-19-00259-CV, 2020 WL 1528062, at *2 (Tex. App.—Tyler Mar. 31, 2020, no pet.) (mem. op.). A court may also consider a juvenile's drug use, association with negative peers, poor academic record, and history of fighting, and it is also relevant if these behaviors occurred while the juvenile was living at home. *See In re T.D.*, 2020 WL 1528062, at *2–4; *In re C.G.*, 162 S.W.3d at 452; *see also In re W.J.P.*, 2021 WL 2931437, at *4 ("A child's behavior while in his parent's custody pending disposition is evidence that a trial court can consider as part of the reasonable-efforts analysis.").

Here, the juvenile court admitted a "probation report," which contained several documents prepared during the pendency of Gabriel's detention. These documents contained extensive information about Gabriel's background, and the documents included statements made by Gabriel and his mother during various evaluations and interviews.

19

The probation report reflected that Gabriel's first offense—for aggravated assault—occurred in September 2021. While that case was pending, Gabriel and his mother participated in therapy together. Gabriel also participated in a substance abuse treatment program at an inpatient facility in Austin. Although he successfully completed this program, he admitted during an evaluation that he immediately smoked marijuana upon returning home from the facility, and he continued to abuse substances—primarily marijuana and Xanax, although he also used synthetic marijuana, alcohol, and cocaine—while he lived at his mother's house. Gabriel stated that he relapsed because "he was worried about his court date," and he used marijuana to "escape from his problems."

In June 2022, the juvenile court found that Gabriel had engaged in delinquent conduct and needed rehabilitation, and the court placed him on probation and allowed him to remain living at home. Two months later, in August 2022, Gabriel ran away from home.[7] Although he was in contact with his mother, his whereabouts remained unknown to her for several weeks.

---

[7] The probation report reflected that Gabriel's mother stated that Gabriel "refuses to comply with house rules," "continues to disobey and disrespect her," and "often leaves the home without permission and has run away from home in the past as well." Gabriel reported that he left home in August 2022 "to protect his family from individuals he was associating with at the time" and "because he thought there was a warrant out for his arrest." Gabriel denied being a member of a gang, but he admitted that he has friends who are gang members.

While on probation for the aggravated assault charge, Gabriel committed a series of violent armed robberies in October 2022. The probation report contained details about the evading detention offense and each of the six aggravated robbery offenses. In each of the aggravated robbery offenses, Gabriel and an associate approached unsuspecting people around the Houston area—usually in or around a gas station convenience store—displayed a firearm, and demanded the individual's money or car keys. On three occasions, Gabriel hit the complainant with his fist or the firearm. Two of the complainants testified concerning the lasting impacts of Gabriel's actions on their daily routines and their mental health. Gabriel stipulated that the allegations in all seven additional offenses were true.

The probation report reflected that Gabriel had several behavioral infractions at the Harris County Juvenile Detention Center while he was detained pending adjudication of the seven later offenses. On two occasions, he was transferred to the Harris County Psychiatric Center, where he remained for approximately one month. However, on both occasions he was transferred back to the Juvenile Detention Center because he did not follow the rules. On the second occasion, which occurred less than a week before the disposition hearing, Gabriel was transferred back to the Juvenile Justice Center because he had tested positive for benzodiazepines. Gabriel also had a history of fighting while he was in school, suspensions, and truancy. Gabriel indicated that he did not believe a traditional school setting would be

21

beneficial for him, but he desired to obtain his GED and learn a trade, such as welding.

The probation report contained information about Gabriel's childhood in Honduras, his journey to the United States, and his experiences in his neighborhood in Houston. Both Gabriel and his mother reported experiencing traumatic events in all three phases of their lives, including receiving threats of violence from drug cartels and witnessing gun violence and death. Gabriel also reported that he had been sexually assaulted by an older female family friend when he was around six years old. He and his mother further reported that his father was estranged from their family, and Gabriel had not had contact with him for several years.

Multiple documents in the probation report discussed Gabriel's history of substance abuse—which began when he was around the age of nine—and his mental health history. Gabriel estimated that prior to being detained, he used marijuana almost daily and used Xanax several times per week. Gabriel self-reported experiencing symptoms of anxiety and depression, and he also reported that he had experienced suicidal ideation when he wasnine to eleven years old. He also reported that he had frequent nightmares and flashbacks to traumatic events in his life. His mother reported that she first took him to a psychiatrist when he was around ten years old, but he did not receive a formal diagnosis at that time. Gabriel was taking several medications while detained, and he was medication compliant.

Clinicians evaluating Gabriel opined that he had substance abuse disorder, symptoms of PTSD, unspecified depressive disorder, and unspecified conduct disorder. One clinician recommended that consideration "be given to placement in a long-term, trauma-focused residential program which can also provide intensive behavioral interventions," but the clinician did not recommend that the court return Gabriel to his home, noting that he had "adjusted poorly to his community supervision." In addition to substance abuse treatment, the clinician believed that Gabriel needed assistance in "identify[ing] his trauma triggers" and "learn[ing] techniques to help him better manage his anxiety symptoms." Documents in the probation report reflected that various clinicians and others involved with the Harris County juvenile justice system recommended that Gabriel be placed with the Harris County Leadership Academy, with commitment to TJJD as a secondary recommendation.

Except for information specifically about Woodward Academy and scholarly research about the impact of adverse childhood experiences, the majority of the information contained in the Mitigation Memorandum was also contained in the probation report or discussed in the testimony of Gabriel's mother and Dr. Manheim. Because most of the information in the Mitigation Memorandum was properly before the juvenile court through other sources, we conclude that the memorandum

23

was cumulative of other evidence and any error in the exclusion of this memorandum was harmless.

Furthermore, we conclude that the juvenile court had sufficient information before it to exercise its broad discretion in determining that commitment to TJJD was a suitable disposition for Gabriel. Although the record contains some evidence that Gabriel could benefit from a trauma-informed treatment program like Woodward Academy or a program such as the Harris County Leadership Academy, the juvenile court also had evidence before it that Gabriel had not adjusted well to probation and that he needed more structure in his life. Specifically, Gabriel admitted that he had run away from home, he frequently did not attend school, and he had committed seven new offenses while on probation. All these offenses involved the display of a firearm, and the six aggravated robberies all involved either violence or threats of violence. Gabriel had problems with substance abuse that persisted during his detention, and he committed numerous rule violations while detained at the Juvenile Detention Center and at the Harris County Psychiatric Center.

We conclude that more than a scintilla of evidence supports the juvenile court's findings that "reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and to make it possible for the child to return to the child's home." *See* TEX. FAM. CODE § 54.04(i)(1)(B); *In re K.H.*, 682 S.W.3d at 576 (considering severity of juvenile's crime, prior assault charge, and behavioral

24

infractions while in detention in determining that sufficient evidence supported juvenile court's finding that reasonable efforts had been made to prevent juvenile's removal from home and to make it possible for him to return home). Additionally, we conclude that while there is conflicting evidence about the appropriate disposition for Gabriel, the evidence supporting the juvenile court's finding is not so weak or so against the great weight and preponderance of the evidence as to be clearly unjust. *See In re K.H.*, 682 S.W.3d at 575–76; *In re C.J.H.*, 79 S.W.3d at 702 (stating that juvenile court does not abuse its discretion if it bases its decision on conflicting evidence).

We overrule Gabriel's sole issue.

## Conclusion

We affirm the juvenile court's two indeterminate judgments and the six determinate judgments.


April L. Farris
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.